# Illinois Official Reports

## Appellate Court

---

**Housing Authority v. Lake County Zoning Board of Appeals**, 2017 IL App (2d) 160959

---

| | |
|---|---|
| Appellate Court Caption | THE HOUSING AUTHORITY OF THE COUNTY OF LAKE and PADS LAKE COUNTY, Plaintiffs-Appellees, v. THE LAKE COUNTY ZONING BOARD OF APPEALS; GREGORY G. KOEPPEN, MARVIN J. RAYMOND, JOHN REINDL, GERALDINE STIMPSON, AL WESTERMAN, CAROL ZERBA, and GEORGE BELL, in Their Official Capacities as Members of the Lake County Zoning Board of Appeals; ERIC WAGGONER, in His Official Capacity as the Director of the Lake County Planning, Building and Development Department; JENNIFER MUELLER; MARY ANN RYAN; AMY FOOR-NOLAND; JOYCE BOZACKI-RAE; MELISSA PEARLMAN-RICH; MARY TOUPS MISKE; SAM FAZIO; CHERYL GOREY; LARRY SCHAEDEL; SHERI BUERGEY; ROSE ARENDARCZYK; DONNA FITZPATRICK; and DANIEL McMANUS, Defendants (Jennifer Mueller, Mary Ann Ryan, Amy Foor-Noland, Joyce Bozacki-Rae, Melissa Pearlman-Rich, Mary Toups Miske, Sam Fazio, Cheryl Gorey, Larry Schaedel, Sheri Buergey, Rose Arendarczyk, Donna Fitzpatrick, and Daniel McManus, Defendants-Appellants). |
| District & No. | Second District<br>Docket No. 2-16-0959 |
| Filed | October 11, 2017 |
| Decision Under Review | Appeal from the Circuit Court of Lake County, No. 15-MR-1133; the Hon. Thomas M. Schippers, Judge, presiding. |

| | |
|---|---|
| Judgment | Affirmed. |
| Counsel on Appeal | Daniel C. Shapiro, Justin A. Silva, and Ian T. Brown, of Shapiro & Associates Law, of Northbrook, for appellants. |
| | Robert J. Masini and David L. Hazan, of Diver, Grach, Quade & Masini, LLP, of Waukegan, for appellee Housing Authority of the County of Lake. |
| | Mariah F. DiGrino, Thomas F. Geselbracht, and Kenneth L. Schmetterer, of DLA Piper LLP (US), of Chicago, for other appellee. |
| Panel | JUSTICE BIRKETT delivered the judgment of the court, with opinion. <br> Justice Schostok concurred in the judgment and opinion. <br> Presiding Justice Hudson dissented, with opinion. |

**OPINION**

¶ 1    In this appeal, we address the issues arising from a change-in-use permit issued by defendant Eric Waggoner, the director of the Lake County Planning, Building and Development Department (Waggoner will hereinafter be referred to as the Director; the Lake County Planning, Building and Development Department will hereinafter be referred to as the Department; neither the Director nor the Department is a party to this appeal), regarding the subject property, commonly known as Midlothian Manor, located in unincorporated Lake County, near the Village of Lake Zurich. The change-in-use permit was issued at the behest of plaintiffs, the Housing Authority of the County of Lake (the Authority) and PADS Lake County (PADS). Following the issuance of the permit, defendants Jennifer Mueller, Mary Ann Ryan, Amy Foor-Noland, Joyce Bozacki-Rae, Melissa Pearlman-Rich, Mary Toups Miske, Sam Fazio, Cheryl Gorey, Larry Schaedel, Sheri Buergey, Rose Arendarczyk, Donna Fitzpatrick, and Daniel McManus (collectively, defendants) administratively appealed the Director's decision to defendant the Lake County Zoning Board of Appeals (Board).[1] Following a three-day public hearing, the Board reversed the Director's decision and denied the change-in-use permit. Plaintiffs appealed, under the Administrative Review Law (735 ILCS 5/3-101 *et seq.* (West 2014)), to the circuit court of Lake County. The circuit court reversed the Board's decision and reinstated the change-in-use permit. Defendants appealed the judgment of the circuit court. On appeal, defendants contend that the Board's decision to reverse the Director's decision was not clearly erroneous because the Director misapplied the

---

[1]The Board is not a party to this appeal.

applicable provisions of the Unified Development Ordinance of Lake County (Unified Development Ordinance) (Lake County Code of Ordinances § 151.001 *et seq.* (adopted Oct. 13, 2009)) in determining that the proposed use of Midlothian Manor would be a "government use (no assembly space)" in a residential area zoned R-1. For the following reasons, we affirm the circuit court's judgment reversing the Board's decision.

## I. BACKGROUND

We summarize the pertinent facts appearing in the record. In 1946, the Authority was established pursuant to the Housing Authorities Act (Act) (310 ILCS 10/1 *et seq.* (West 2014)). The Authority was created to address the "shortage of safe and sanitary housing" available in Lake County to persons of limited financial resources. The Act empowers the Authority to create low-rent housing projects, as well as to build and operate housing accommodations. See 310 ILCS 10/2 (West 2014). The Authority is also expressly authorized to make and execute contracts with others to carry out its objectives. See 310 ILCS 10/8.5 (West 2014). The Authority works on its own and with developers to fulfill its statutory goals.

The Authority's operations dovetail with the objectives of the United States Department of Housing and Urban Development (HUD). HUD has directed public housing authorities to work to end homelessness, specifically for the "chronically homeless," whom HUD defines as persons with disabilities that contribute to their homelessness. The Authority, in conjunction with the Lake County community development department and the Lake County Coalition for the Homeless, developed the "Zero: 2016 Campaign" to end chronic homelessness. In addition to this partnership, there are a number of other facilities in Lake County that address the issue of homelessness run by county governmental bodies, other charitable organizations, and PADS.

In 2006, the Authority, in collaboration with other public and private entities, drafted the "Lake County 10 Year Plan to End Homelessness," which included goals specifically targeting chronic homelessness. The plan's goal was to create 44 new permanent housing units throughout Lake County for chronically homeless persons. The proposed use of the subject property would prevent the loss of 13 units of permanent housing for the chronically homeless and would add one new unit.

Founded in Lake County in 1972, PADS is an Illinois not-for-profit organization that supports homeless persons. To that end, PADS offers services including temporary emergency shelter, permanent supportive housing, and comprehensive support. On average, PADS assists between 1800 and 2000 persons every year.

As is relevant to this appeal, PADS operates a program named "Safe Haven." Safe Haven offers permanent housing support to chronically homeless adults. Adults who have mental illnesses or other issues that prevent them from achieving stable housing situations are eligible for assistance from the Safe Haven program. PADS's objective in helping the chronically homeless draws its definitions, as well as some funding, from HUD. HUD's definition of chronically homeless persons includes those with physical, mental, and developmental disabilities. Following HUD's lead, PADS's Safe Haven program subscribes to the approach of "housing first/harm reduction," which allows persons to enter the program with limited barriers. The program attempts to provide a period of stabilization, followed by the initiation of services, and eventually attempts to transition the participants into permanent housing.

Historically, the participants have been about 60% male and 40% female, with some, but not all, being veterans of the armed services.

¶ 8       At the time of the proceedings before the Board, Safe Haven was operated out of the federal Veteran's Administration facilities in North Chicago. The federal facilities needed the space occupied by Safe Haven, so for several years, PADS looked for a new facility to house the recipients of Safe Haven's services. In North Chicago, Safe Haven provided 13 rooms; the residents were not permitted to eat or cook in their rooms, but they were offered a meal service, along with support from staff, including a social worker and a nurse. When PADS was required to relocate Safe Haven, it submitted a proposal to use the then-vacant Midlothian Manor building to house the program. PADS contemplates that the residents will be able to use their in-room kitchenettes to prepare frozen or prepackaged meals and will be able to eat in their rooms.

¶ 9       Midlothian Manor was constructed in 1997 and used as an assisted living facility for low-income elderly persons. The building is about 9500 square feet, it is a single-story L-shaped structure, and it is sited on a 2.56-acre lot located in an area zoned R-1, a low-density residential zoning district. As it stands, the building has 14 attached single-room occupancy units. Included are common areas, such as a lobby, a laundry facility, and a kitchen that contains an oven, a stove, and a sink. Each unit has a kitchenette, consisting of a countertop, a microwave oven, and a small refrigerator. The units do not include kitchen-area sinks; instead, the occupants will be expected to use their bathroom sinks for water needs and hygiene. The units all have bathrooms and exterior patios. The patios, however, are not contemplated for use by the residents but only to provide exits in case of a fire or other emergency.

¶ 10      Around 2001, the ownership of Midlothian Manor was transferred to the Authority. According to the Director, zoning staff was not consulted at the time of the transfer, so there was never a determination of the subject property's use in the Department's records. The Authority operated Midlothian Manor as a senior assisted-living facility between 2001 and 2010. Around 2010, due to chronic operating losses, the Authority discontinued operating Midlothian Manor, and the building stood vacant. Defendants point out that, from 2001 through 2014, the Authority did not seek to have the subject property reclassified as a "government use."

¶ 11      While Midlothian Manor lay vacant, the Authority explored ways to use it. Eventually, the Authority issued a request for proposals of ways to use Midlothian Manor to provide housing and services to homeless persons. PADS submitted a proposal, suggesting that it could operate its Safe Haven program at Midlothian Manor. The Authority accepted PADS's proposal.

¶ 12      In 2014, the Authority entered into negotiations with PADS to lease Midlothian Manor for PADS's Safe Haven program. Around September 2014, PADS and the Authority approached the Department, seeking guidance regarding the proposed use and the zoning requirements. Department staff suggested, based on the information available in September, that PADS's proposed use was consistent with the assisted-living use defined in the Unified Development Ordinance and that such a use would require a conditional-use permit. (As part of the process to obtain a conditional-use permit, a public hearing on the proposed use would be required.) On October 30, 2014, the Department provided PADS and the Authority with an application for a conditional-use permit.

¶ 13      After the Department, PADS, and the Authority had more discussions and exchanged information, on November 13, 2014, Brittany Sloan, the Department's deputy director,

- 4 -

suggested to the Department's counsel that it might be feasible to classify the proposed use as a "government use." This had the advantage of being a permitted use in the R-1 zoning district and would not require PADS and the Authority to obtain a conditional-use permit.

¶ 14 Apparently, after Sloan's suggestion, the die was cast: on January 21, 2015, PADS submitted a change-in-use permit application for the subject property. In the application, PADS represented that the then-existing use of the property was "vacant government" and requested a permit for "government use—Save Haven project." On February 2, 2015, the Director granted PADS's application. On February 4, 2015, defendants, all of whom reside near Midlothian Manor, administratively appealed to the Board, seeking to reverse the Director's decision granting PADS's change-in-use permit from, as represented by defendants, "its previous use as an Assisted Living facility to a 'Government Use.' "

¶ 15 Beginning on May 12, 2015, the Board held a hearing on defendants' appeal. The Director testified about how he had made the decision to grant PADS's application for a change-in-use permit. The Director noted that he considered information that had been presented to the Department's staff along with information that was not available to be considered by the staff; accordingly, he had considered more information than the staff had.

¶ 16 The Director explained that "the first primary responsibility in these kinds of matters where there is a potential for a use to be classified as a government use is to look at the actual ownership of the property and the purpose to which the property would be used." The Director asserted that, if the property's use would directly satisfy a statutory responsibility of the governmental unit involved, then he would classify it as a government use.

¶ 17 The Director illustrated his thought process by hypothesizing two road construction equipment storage facilities: one owned by a governmental entity, such as a township, and one owned by a private entity, such as a road-building contractor. Under the R-1 zoning classification, the facility owned by the governmental entity would be permitted as a government use; the facility owned by the private entity would not be permitted at all. In the Director's view, the Authority's lease of Midlothian Manor to PADS did not disturb the governmental ownership and, because the Act contemplated private operators, PADS's use of Midlothian Manor to house its Safe Haven program would directly satisfy the Authority's statutory responsibility. The Director thus concluded that the proposed use constituted a government use, which was a permitted use in an R-1 zoning district.

¶ 18 The Director testified that he did not directly consider appendix F of the Unified Development Ordinance. Appendix F, according to the Director, is a "non-regulatory" guide to assist in assigning a specific use type based on a use category. The Director testified that, as such, it was only an informational exhibit and the actual language of the ordinance takes precedence over the examples given in the appendix. Thus, the Director acknowledged that, although appendix F placed "government use" into the nonresidential category, that categorization did not control his determination because the actual language of the ordinance trumped appendix F's categorization. The Director also testified that he did not consider the "Lake County Regional Framework Plan" because the plan is an aspirational and guiding document, not a regulatory document like the ordinance.

¶ 19 The Director consulted the use table of the Unified Development Ordinance. See Lake County Code of Ordinances § 151.111 (adopted Oct. 13, 2009). "Government use (no assembly space)" is listed as a permitted use in an R-1 zoning district. *Id.* The other categories of government use, "Government use (10,000 sq. ft. or less of assembly space)," "Government

- 5 -

use (more than 10,000 sq. ft. of assembly space)," and "Community service not otherwise classified," all require a conditional-use permit in an R-1 zoning district. *Id.* The use table groups all the government uses into the use category "Community service." *Id.* Section 151.270(D)(3) of the Unified Development Ordinance provides:

"(3) Community service.

(a) *Characteristics.* Community services are uses of a public, non-profit, or charitable nature generally providing a local service to people of the community. Generally, they provide the service on-site or have employees at the site on a regular basis. The service is ongoing, not just for special events. Community services or facilities that have membership provisions are open to the general public to join at any time, (for instance, any senior citizen could join a senior center). The use may provide special counseling, education, or training of a public, non-profit, or charitable nature.

(b) *Accessory uses.* Accessory uses may include offices; meeting areas; food preparation areas; parking, health and therapy areas; and athletic facilities.

(c) *Examples.* Examples of the community service uses 'not otherwise classified' include the following: libraries, museums, neighborhood or community centers, senior centers, and youth club facilities.

(d) *Exceptions.*

1. Private lodges, clubs and private or commercial athletic or health clubs are classified as retail sales and service.

2. Public parks and recreation are classified as parks and open space." Lake County Code of Ordinances § 151.270(D)(3) (amended Aug. 14, 2012).

¶ 20    After settling on "government use," the Director turned to the issue of assembly space. Section 151.112 deals with use standards. It provides:

"(W) *Government use.* The standards of this subsection shall apply when a government use is located within a platted residential subdivision and takes direct access exclusively to a local road:

(1) *Operational requirement.* Hours of Operation shall be limited to 8:00 a.m. to 8:00 p.m.; any assembly occurring outside these established hours of operation shall require a temporary use permit in accordance with § 151.114(K) [(Lake County Code of Ordinances § 151.114(K) (adopted Oct. 13, 2009))]. A maximum of 15 such events per calendar year (per zoning lot) shall be permitted. Requests for modifications or waivers from the limits of this subsection shall require review and approval in accordance with the delegated conditional use permit procedures of § 151.050 [(Lake County Code of Ordinances § 151.050 (amended Aug. 14, 2012))]. This operational requirement shall not apply to the following activities: ancillary activities unrelated to the core service functions of the government institution, involving, in the aggregate, only a fraction of the assembly space.

(2) *Classification.* A school, day care, or camp associated with the use shall be classified as a separate principal use." Lake County Code of Ordinances § 151.112(W) (amended July 14, 2015).

¶ 21    In turn, section 151.114(K) provides:

"(K) *Events of public interest.* Events of public interest, including but not limited to picnics, races for motorized vehicles, water craft or air craft races, fishing derbies,

dinner dances, fundraisers, survival games, haunted houses, outdoor concerts, auctions, tent meetings, and supervised public display of fireworks shall be subject to the following standards." Lake County Code of Ordinances § 151.114(K) (amended July 14, 2015).

Section 151.114(K) also provides a "commentary" providing examples of events that will not be considered to be events of public interest: "Private non-commercial events on the sponsor's property such as home owners' associations picnics at the subdivision park, corporate picnics on the corporate campus, private weddings at a private residence or subdivision clubhouse, and the like, are not considered events of public interest." Lake County Code of Ordinances § 151.114(K), Commentary (amended July 14, 2015).

¶ 22    Finally, "assembly space" is defined in section 151.271 (Lake County Code of Ordinances § 151.271 (amended Oct. 13, 2015)). Section 151.271 initially provides guidance regarding its use in defining the terms listed in that section:

"Words and terms used in this chapter [(specifically referring to the Unified Development Ordinance)] shall be given the meanings set forth in this section. All words not defined in this section shall be given their common, ordinary meanings, as the context may reasonably suggest. The use-related terms are mutually exclusive, meaning that uses given a specific definition shall not also be considered to be a part of a more general definition of that use type. A 'bookstore', for example, shall not be considered a general 'retail sales and service' use, since 'bookstore' is a more specific definition of that use." *Id.*

Among the defined terms, "assembly space" is defined as "[s]pace intended to accommodate a group of people gathered together, for a particular purpose, whether religious, political, educational, or social." *Id.* Examples include, but are not limited to, "meeting rooms/halls, classrooms, worship halls, and social halls." *Id.* The section also defines "government building (or use)" to mean: "A building or structure owned or leased by a unit of government and used by the unit of government in exercising its statutory authority." *Id.* Examples of government buildings include, but are not limited to, "township and forest preserve structures, postal offices, public sewage treatment plants, public water treatment plants, fire stations, and public libraries." *Id.*

¶ 23    The Director testified that he consulted the above-quoted provisions while puzzling over the issue of assembly space. In the Director's opinion, "assembly space" was related to "functions of a public nature" because the definition of government use referred to events of public interest in discussing its contours and requirements. The Director explained that a function of a public nature was where the public had "come to a particular property for a particular gathering purpose, rather than residents of that actual building." In the Director's view, section 151.271's examples of assembly space addressed situations that were generally public and social. The Director testified that "[a]ssembly space is space in which the public assembles," requiring public access. The Director distinguished private gatherings, testifying that "[i]t is not [a public] event when someone has a family dinner at one's house." In arriving at this conception of assembly space, the Director noted that he had reached a similar interpretation during a text-amendment process two years before these proceedings. Also important to his decision was the fact that, according to the information he reviewed, the common areas identified in Midlothian Manor would be used only for the residents of the facility and the support staff. In the Director's opinion, the fact that there was no "assembly

- 7 -

space," because it was not open to the general public, meant that section 151-112's provision limiting the hours of operation to 8 a.m. to 8 p.m. did not apply.

¶ 24 On November 19, 2014, the Director advised the Authority of his determination that the proposed use of Midlothian Manor would be a "government use (no assembly space)," which was permitted in the R-1 zoning district. On February 2, 2015, a building-and-use permit was issued. The permit identified certain physical improvements to be completed before a certificate of occupancy would issue. The permit authorized the change in use from "vacant" to that proposed by the Authority.

¶ 25 The Director testified that, between his determination and the issuance of the building-and-use permit, he had been contacted by many of the neighbors of Midlothian Manor. On January 12, 2015, the Authority and PADS, upon the Department's request, held an informational meeting to inform the neighbors about the proposed use. Roughly 60 to 70 people attended the informational meeting. The Authority and PADS fielded questions, with the neighbors voicing concerns that Midlothian Manor would now house dangerous criminals, sex offenders, drug dealers, and other negative elements of society. The Authority and PADS attempted to present project details and to allay the neighbors' concerns. After the meeting, PADS established voicemail and e-mail inboxes to receive and respond to any other questions that arose. Schaedel contacted PADS to request a meeting with PADS and the Authority. Before that meeting could be arranged, PADS had been sued by Schaedel and others in Residents for an Engaged Community v. Lake County, No. 15-CH-200 (Cir. Ct. Lake Co.). That case was dismissed without prejudice, pending the disposition of defendants' appeal to the Board challenging the Director's decision.

¶ 26 After receiving the testimony of the Director and others over the course of the three-day hearing, the Board voted to reverse the Director's determination. Board member Raymond explained his reasoning:

"You probably don't know the kind of agony that we go through because we know how emotional this is, and that we have to rely on facts and what's being presented to us, and that there are many different ways in which facts can be interpreted.

As I have gone through this time and time and time again, I keep relying on the tables of the [Unified Development Ordinance]. And the one point that I am sticking with is that we are dealing with a zoning issue. And therefore, when I look at our zoning use tables and R-1, which the area is zoned, and the only thing that is permitted in R-1 is a government use. I have a feeling sometimes we are trying to put a round peg in a square hole, and we are trying to find the round hole to put the round peg in. And so that's where I am right now.

I am not going to divulge how I am going to vote, but this, to me, is what I am basing my decision on."

Raymond eventually voted to reverse the Director's determination.

¶ 27 Board member Westerman discussed his reasoning:

"Again, I appreciate everybody coming out and being very respectful of each other. And you know, I have heard a lot of opinions and interpretations here, but I am kind of the one that always goes by the book.

I'd like to talk a little bit about the two issues that are in front of us. One of them is a determination that is this a government use or not? And if we do agree it is a

- 8 -

government use, then [the] second issue comes on, for example, about the assembly space.

And I have to really begin here with the definition of the 'government building' or 'use' in the [Unified Development Ordinance]. And you have heard this, and I will state it again. It says, 'a building or structure owned or leased by a unit of government and used by the unit of government exercising the [*sic*] statutory authority.' And in that statement, the two things really pop out for me is that the structure is owned or leased by a unit of government and it is used by the unit of government.

I found no evidence today that there is a right that a governmental agency can lease it out to a not-for-government [*sic*] agency and still retain the category of government use.

And in this case in front of us, another issue came up, and that was the potential sale of Midlothian Manor to the AIM North Corporation. And Mr. Northern here [(executive director/chief executive officer of the Authority)], he testified that although it hasn't been consummated yet, it still is a very active resolution. So therefore, the [Authority] will be disposing of this property to a private not-for-profit group. It really doesn't retain then its government use.

So I feel the testimony that I heard today is that this is, as presented to us, this is not a government use because they are leasing it to a nongovernment agency, and the property's going to be sold to a nongovernment agency. And I will hold off and not talk about the assembly space now because I don't know how the other board members feel about it."

Westerman eventually voted to reverse the Director's determination.

¶ 28    Board member Stimpson explained her reasoning:

"Hopefully, you have all learned more than you ever want to know about the [Unified Development Ordinance]. It's very confusing. There are a lot of charts, tables, refer to this section, refer to that section. Much of the information we were presented really didn't have pertinence to this particular case, but was interesting, was helpful, gave people some insight as to housing authorities, PADS, and very emotional for all of you neighbors that live in that subdivision and are worried about what's going to happen with that piece of property.

As far as trying to figure out if somebody made a mistake here or erred in deciding what should be done with this piece of property, [the Director] is the administrator of the zoning board; and he does have a staff, and his staff did take care of this originally. And it sounded like most of the people in the neighborhood thought it was going to be a conditional use permit, and then it was decided that it was a government entity.

I don't think I can disagree with [the Director] that it is. And in that respect, when you start to follow his train of thought through that government use process, I don't think that he made a mistake or he made any error or that he tried to sidestep this board, which is something that I heard, too. So that's kind of where I am coming from at this particular hearing."

Stimpson voted to affirm the Director's determination.

¶ 29    Board member Zerba discussed her reasoning:

"Well, as I did mention one other time when I had a chance to say something, I said that the [Unified Development Ordinance] is sometimes difficult to interpret. I mean, you can interpret, you know, different language and different semantics in different ways, and not to say that any of the interpretations is erroneous.

I will discuss the word 'assembly' a little bit. In my brain, my simplistic little brain, assembly is just a gathering. And I would have to say just by the size of the so-called entry, but I don't really think it's just an entry, I would consider that to be a place of assembly. So that's where I am coming from with that.

I would have much preferred that if the government use were going to be tagged on to something, I would have preferred that it be with assembly [space] with a conditional use permit. That would have been my preference.

\* \* \*

The other issue that I would just like to bring up is that in my brain, too, I would consider Midlothian Manor to be group living. And as such, I mean, I just can't think that it couldn't be group living. That's me. And that's not allowed in R-1. So you probably can see where I am heading. So I will stop."

Zerba ultimately voted to reverse the Director's determination.

¶ 30      Next, Board member Reindl[2] voiced his reasoning:

"Well, I listened to the tapes for a length of time, a great length of time, and, needless to say, was very moved by all the compassion that was extended during those first two hearings; and the majority of it was compassion. However, Mr. Shapiro [(defendants' counsel)] pointed out a very, very good argument in those opening days, and I came here today wanting my mind to changed; but thus far, it hasn't been. I look at it with three different areas.

First of all, the use, the government use; secondly, the assembly, and in the assembly, I tied 'group.' Each one of those two—that's bad English. Those two issues are not allowed in an R-1 [zoning district], plain enough. Government use, could almost flip a coin the way this was going as far as the government use is concerned. It's a building that has been vacant. The government county [*sic*] owned it, blah, blah, blah. The use of it during its vacancy was dormant.

Somewhere way, way, way, way back in our ordinance, if a use were discontinued for a certain length of time—I'm going from memory now. This is quite a number of years ago—that use had to be renewed through another permit, permitting process. And I heard no evidence to that effect, either for or against; so I'm out on a limb on that until somebody straightens me out. But that's my feeling. That's where I am at."

Reindl voted to reverse the Director's determination.

¶ 31      Acting chairman Koeppen[3] delivered his thoughts:

---

[2]Reindl replaced Board chairman Bell on the third day of the hearing. The Board voted to allow Reindl to serve and accepted his review of the tapes of the first two days of the hearing as sufficient to bring him up to speed.

[3]Chairman Bell had to leave the hearing after the second day of testimony due to a personal emergency. Koeppen became acting chairman; Reindl replaced Bell.

"Thank you. I think the question before us today isn't whether we support PADS or homeless. That's not the question. That's how I approached this throughout. I think we all do, as [defendants' counsel] said in his closing arguments. And so I applaud PADS for their work. I applaud the [Authority] for their work.

I think the question before us is was an error made in this being allowed in the way it was handled. And I think, based on the testimony, I do feel an error was made. I don't think the proper procedures were followed.

Our staff does an outstanding job, and I will support our staff every day, as I have in the past publicly, and we have conversations. They do an outstanding job, and we are very proud of the work they do. But in this case, I don't think the decision was properly formulated.

Clearly, this is an R-1 [zoning district]. And I can't find that government use, based on the testimony—and I struggle with that assembly space too, is the big thing for me. I just don't feel that is the proper zoning for this. And based on that and the presentations that have been made, that's where I am coming from."

Koeppen voted to reverse the Director's determination.

¶ 32    On June 4, 2015, the Board issued its written "findings and decision." The Board recapped the evidence presented during the hearing. The written decision also polished a bit the Board members' verbal reasoning in attempting to capture the Board's rationale in reversing the Director's determination:

"(a) Marvin Raymond stated that in deciding this issue he must rely on facts and the tables in the [Unified Development Ordinance] concerning a zoning use and the zoning use tables show this area to be [zoned] R-1 and that government use is permitted in an R-1 [zoning district], but he questioned whether this was appropriately classified as a government use.

(b) Al Westerman noted that the term government use goes to the definition found in the [Unified Development Ordinance] of government use. He noted that the owner of the property must be a governmental unit for this to be a government use. He finds no evidence of the ownership using the property for a government use, that the governmental entity is leasing to a not-for-profit [nongovernmental entity] and that therefore he cannot find this to be a government use.

(c) Geraldine Stimpson observed that [the Director] is the administrator and he and his staff are charged with the responsibility of looking at all applications and deciding whether a conditional use permit is required. She further stated that when [the Director] decided that this was a government use, he was correctly interpreting the [Unified Development Ordinance] and thought that the Board members should support the staff's conclusion.

(d) Carol Zerba stated that the [Unified Development Ordinance] is sometimes difficult to interpret and she found significant that the term 'assembly' in the [Unified Development Ordinance] would encompass the assembly area of Midlothian Manor. She observed that it is hard to stay focused on the zoning issues and in essence finds that the proposed use by Midlothian Manor to be group living, which is not allowed in an R-1 [zoning district].

(e) John Reindl stated that his review of the testimony presented at the first two days of hearings showed that the use, particularly the assembly and group living are not allowed in an R-1 [zoning district]. For him, this is a close issue as to whether the government use [*sic*], but is greatly influenced by the group living definition, which he finds to be applicable to Midlothian Manor and not consistent with an R-1 [zoning district].

(f) Acting Chairman Greg Koeppen noted that the question before the Board is not whether PADS['s] mission in providing shelter to the homeless is a good or bad idea. He stated that he expected that everybody would find that to be [a] laudable goal. However, he feels that based on the evidence presented, he cannot find the proposed use of Midlothian Manor is a governmental use and thereby would not support the classification as a governmental use and for the reasons stated on the record."

The Board held "that [defendants' appeal to the Board] was allowed and that [the Director's] interpretation of the proposed use by PADS of Lake County pursuant to a lease with [the Authority] as a governmental use was reversed."

¶ 33    The Authority timely took an administrative appeal to the circuit court. On June 15, 2016, PADS moved to realign the parties and to adopt the Authority's complaint as its own. Over the Board's objection, PADS's motion was granted, and PADS was designated as a plaintiff. The matter advanced to argument and, on November 8, 2016, the circuit court reversed the Board's decision. Defendants timely appeal.

¶ 34                                    II. ANALYSIS

¶ 35    On appeal, defendants argue that the Board correctly reversed the Director's determination. Defendants purport to raise seven issues on appeal, minutely dissecting the Board's actions with regard to the Director's determination. For their part, plaintiffs suggest that defendants actually raise nine issues on appeal, including whether the circuit court erred in reversing the Board. In our view, all of these issues can be framed under the umbrella of whether the Board's decision to reverse the Director's determination was clearly erroneous. At root, defendants contend that the Director misapplied the applicable provisions of the Unified Development Ordinance in determining that the Authority's and PADS's proposed use of Midlothian Manor was a "government use (no assembly space)." Defendants urge that, because the Director misapplied the relevant provisions, the Board's decision reversing the Director's determination was not clearly erroneous and must be affirmed.

¶ 36                               A. Standard of Review

¶ 37    The parties dispute the correct standard of review to be employed in this case. Defendants urge that we employ the "clearly erroneous" standard, while plaintiffs urge that *de novo* review applies. This case arises from the administrative review of the Board's decision to reverse the Director's determination. In the administrative-review context, it is the administrative body's decision that is reviewed, not the circuit court's. *Goodman v. Ward*, 241 Ill. 2d 398, 405 (2011). The standard of review to be employed depends on what is disputed: the facts, the law, or a mixed question of fact and law. *Id.* Where the historical facts are admitted or established, the controlling rule of law is undisputed, and the issue is whether the facts satisfy the statutory standard, the case presents a mixed question of fact and law, and the standard of review is "clearly erroneous." *Id.* at 406. The "clearly erroneous" standard is between the *de novo* and

the against-the-manifest-weight-of-the-evidence standards and provides a measure of deference to the agency's experience and expertise. *Lombard Public Facilities Corp. v. Department of Revenue*, 378 Ill. App. 3d 921, 928 (2008). On the other hand, if the question presented is whether the controlling rule of law was correctly interpreted, review is *de novo*, which is an independent and nondeferential standard of review. *Goodman*, 241 Ill. 2d at 406.

¶ 38 Defendants argue that there are numerous facts in dispute, as well as issues about whether the facts satisfy the controlling legal rules, so we should apply the "clearly erroneous" standard. Plaintiffs, on the other hand, contend that the facts are established and the controversy is simply whether the Board correctly interpreted the appropriate legal provisions, so our review should be *de novo*. Defendants suggest that facts, such as when the Director determined that the proposed use of Midlothian Manor could be considered a "government use," remain in dispute. Our review of the record shows that the facts that defendants claim are in dispute are not material to the Director's decision or to the Board's decision to reverse the Director. The material facts, therefore, are undisputed. With that said, however, the question presented on the material facts is not solely whether the Board and the Director properly interpreted the governing legal provisions, but also whether the undisputed material facts satisfied the appropriate standards set forth in the controlling statutes and ordinances. This presents a mixed question of fact and law, which is reviewed under the "clearly erroneous" standard. *Id.* However, to the extent that we are called upon to interpret the language of the various statutes and ordinances, our review is *de novo*. *Barbara's Sales, Inc. v. Intel Corp.*, 227 Ill. 2d 45, 57-58 (2007); *Hawthorne v. Village of Olympia Fields*, 204 Ill. 2d 243, 255 (2003).

¶ 39                                      B. The Board's Decision

¶ 40 The Board voted 5 to 1 to reverse the Director's determination. The five members voting to reverse could not agree on a consistent rationale. What was consistent, however, was the Board's view of its task. At the outset of the hearing before the Board, Bell defined the purpose of the hearing: "At issue tonight is the definition of a government use, and not the suitability of the property, the subject property, for locating such a use." In his summation, Koeppen stated that "the question before us is was an error made in this [(the classification of Midlothian Manor)] being allowed [(determined to be a government use (no assembly space))] in the way it was handled." The Board, then, appears to have consistently considered its task to be to consider the propriety of the Director's decision to classify the proposed use of Midlothian Manor as a government use.

¶ 41 Stimpson, the member who voted to affirm, concluded that the Director had correctly interpreted the Unified Development Ordinance and deferred to his judgment. Two of the members voting to reverse, Raymond and Koeppen, questioned whether Midlothian Manor had been correctly classified as a government use, but their doubts as to the correctness of the classification were based on different factors. Raymond simply questioned whether the classification was correct; Koeppen held that the evidence did not support a classification of government use. Two of the members, Zerba and Reindl, believed that the correct classification of Midlothian Manor should have been as a group-living facility. Reindl, however, stated that he believed that the issue could have been decided by a coin flip. Zerba and Reindl also believed that Midlothian Manor contained assembly space, presumably of less than 10,000 square feet, which meant that it could not be classified as a government use with no assembly space. One of the members, Westerman, believed that the Director used the wrong

definition because there was no evidence that a unit of government could lease the property to a not-for-profit entity and yet satisfy the definition of a government use.

¶ 42    We see, then, that the reversing members did not appear to settle on a singular rationale. Indeed, Zerba and Reindl offered multiple rationales just by themselves. If we attempt to discern the common denominators among the manifold reasons given to reverse the Director's determination, we see that three members based at least part of their rationales on the classification of the property as a government use. Two members specifically asserted that the property contained assembly space for which the Director did not account. Two of the members believed that "group living" was a more appropriate classification. One member believed that the definition of a government use did not allow the Authority to lease the subject property to a private entity. There is therefore no majority rationale elucidated in the members' remarks or in the Board's written decision. Instead, there is a plurality that believed that the Director incorrectly classified the proposed use as a government use, with smaller groupings suggesting different reasons for why they believed that the Director erred.

¶ 43    The plurality, in keeping with the Board's apparent conception of the purpose of its review, believed that the Director had misclassified the proposed use of Midlothian Manor. Among the members who reversed on the classification ground, one (Raymond) expressed only that the classification was incorrect without any elaboration, one (Koeppen) held that the evidence was insufficient to support the classification, and one (Zerba) believed that the classification should have been "group living" under the Unified Development Ordinance. Two of the members (Zerba and Reindl) expressed that the presence of assembly space prevented the classification as "government use (no assembly space)," two (Zerba and Reindl again) considered that the proposed use more closely resembled group living, and one (Westerman) believed that the definition of a government use was incompatible with the Authority's plan to lease the subject property to private albeit not-for-profit entity. Finally, only one member (Reindl again) commented directly on the Director's decision to classify the proposed use as a government use, believing that the issue was close enough to be settled by a coin flip.

¶ 44    While a plurality of the Board members expressly cited "improper classification" as their reason for reversing the Director's determination, each arrived at that decision by a different chain of reasoning. The only agreement as to the reasoning among the Board members involved either assembly space or group living, and no more than two members expressed such reasoning.

¶ 45    Our task here is to review the Board's decision. As we have seen, though, it is difficult to pin down exactly why that decision came to be. It suffices, for the moment, to acknowledge that, by a 5 to 1 vote, the Board held that the Director erred in classifying the proposed use of Midlothian Manor as a government use and reversed his determination.

¶ 46    Defendants expressly argue that there is a "decisive majority" of Board members who "determined that the proposed use is not [a] government use" as defined by the Unified Development Ordinance. It is true that the Board, by a 5 to 1 vote, reversed the Director's determination that the proposed use was "government use (no assembly space)." This is the decision we are reviewing. It is also true that no single rationale was endorsed by a majority of Board members (and some individual Board members were unable to provide majority rationales to support their own decisions). Defendants suggest that the disagreement as to rationale is unimportant because all that matters is the vote to reverse. In practical effect, the reversing Board members all agreed that the Director's decision had to be reversed. However,

it seems to matter that only a plurality of three out of six members agreed that this was a classification error (and, of those three members, there were two who suggested that the "government use" classification was incorrect and should have been "group living" instead, with one finding the classification wrong without further comment), while two suggested that the designation of "no assembly space" was the fatal error, perhaps suggesting that "government use" was not an error.

¶ 47                                   C. Government Use

¶ 48     Defendants argue that this case turns on whether the Director correctly determined that the proposed use of Midlothian Manor as the venue of the PADS's Safe Haven program was a government use with no assembly space. As an initial step, then, we must determine how the Unified Development Ordinance defines "government use." We use the same rules to interpret an ordinance as we use when interpreting a statute. See *Henderson Square Condominium Ass'n v. LAB Townhomes, LLC*, 2015 IL 118139, ¶ 67. The objective in interpreting an ordinance is to ascertain and give effect to the legislative body's intent in enacting the provision. *Id.* The best indication of legislative intent is the language used, given its plain and ordinary meaning. *Id.* If the language is clear and unambiguous, it will be given effect without using any other aids of statutory construction. *Id.*

¶ 49     Section 151.271 of the Unified Development Ordinance defines "government use." Lake County Code of Ordinances § 151.271 (amended Oct. 13, 2015). Section 151.271 initially sets forth express interpretive principles (which recapitulate the principles of statutory construction set forth immediately above). *Id.* Specifically, section 151.271 provides:

>     "Words and terms used in this chapter [(specifically referring to the Unified Development Ordinance)] shall be given the meanings set forth in this section. All words not defined in this section shall be given their common, ordinary meanings, as the context may reasonably suggest. The use-related terms are mutually exclusive, meaning that uses given a specific definition shall not also be considered to be a part of a more general definition of that use type. A 'bookstore', for example, shall not be considered a general 'retail sales and service' use, since 'bookstore' is a more specific definition of that use." *Id.*

"Government use" is defined to be "[a] building or structure owned or leased by a unit of government and used by the unit of government in exercising its statutory authority." *Id.*

¶ 50     Defendants suggest that the definition of "government use" has three elements: (1) a building or structure owned or leased by a unit of government (2) and used by the unit of government (3) in exercising its statutory authority. Defendants urge that the first element requires that a government unit must either own the property or be the lessee of the property. In making this interpretation, defendants emphasize "leased by." In their view, "leased by" signifies the status of lessee; if the government unit had been meant to be the lessor, the ordinance would have used "leased from."

¶ 51     In our view, the first element can best be seen by applying the disjunctive "or" distributively. As a practical matter, the subject property is a building, so we need not consider the disjunctive between building and structure. If we disregard "structure," then the first element becomes: (a building owned by a unit of government) or (a building leased by a unit of government). The disjunctive "or" between the two parentheticals means that the concept of "owned by" excludes the concept of "leased by." This suggests that the government unit must

own the building or it must be the lessee of the building. This comports with defendants' construction to a certain extent; however, the concept of "owned" does not exclude the government unit from owning the building and becoming the lessor of the building. Indeed, the first element does not seem to preclude a situation in which the government unit is the lessee of the building but then subleases the building to another, so long as the owner/lessor allows the sublease. In this case, however, the Authority is the owner of the subject building, so the first element reduces to: a building owned by a unit of government.

¶ 52    The second element, according to defendants, is "used by the unit of government." The second element is joined to the first element by the conjunctive "and," meaning that both the first and second elements must be true. The second element, however, is limited by the third element, the prepositional phrase, "in exercising its statutory authority." The second element will be true only where the unit of government is exercising its statutory authority.

¶ 53    In defendants' view, the third element means that the unit of government must directly or "personally" exercise statutory authority. Defendants base this construction on the inclusion of the word "its." If, however, the statutory authority may be exercised by proxy, we cannot say that "its" necessarily requires the statutory authority to be exercised directly or "personally" by the unit of government. In our view, then, the first element, as defined by defendants, does not preclude the owner from leasing the building to another, as long as the lease constitutes a use of the building (second element) that comports with the exercise of the unit of government's statutory authority (third element).

¶ 54    How can we discern whether the use of a building constitutes an exercise of the unit of government's statutory authority? For that, we look to the authorizing statute. In section 2 of the Act (310 ILCS 10/2 (West 2014)), the legislature declared that the creation of housing authorities was a matter of public interest in order to promote and protect the public interest. Housing authorities were vested with "all powers necessary or appropriate" to "engage in low-rent housing and slum clearance projects," to "provide rental assistance," and to "undertake land assembly, clearance, rehabilitation, development, and redevelopment projects" in the service of relieving "the shortage of decent safe, affordable, and sanitary dwellings." *Id.* To further these purposes, housing authorities were given "the power to acquire and dispose of improved or unimproved property, to remove unsanitary or substandard conditions, to construct and operate housing accommodations, to regulate the maintenance of housing projects and to borrow, expend, loan, invest and repay monies" for those purposes. *Id.*

¶ 55    Section 8 of the Act (310 ILCS 10/8 (West 2014)) declares that a housing authority:

"shall be a municipal corporation and shall constitute a body both corporate and politic, exercising public and essential governmental functions, and having all the powers necessary or convenient to carry out and effectuate the purposes and provisions of this Act, including, in addition to others herein granted, the powers enumerated in Sections 8.1 through 8.8, inclusive."

Among the enumerated powers expressly granted to a housing authority is the power "to assist through the exercise of the powers herein conferred any individual, association, corporation or organization which presents a plan for developing or redeveloping any property" within the housing authority's purview, which plan will promote the housing authority's purposes. 310 ILCS 10/8.2 (West 2014). In addition, a housing authority has the power "to make and execute contracts and other instruments necessary or convenient to the exercise of the powers of the [housing authority]." 310 ILCS 10/8.5 (West 2014).

¶ 56    The Act thus empowers the Authority to contract with any entity, for-profit or not-for-profit, in furtherance of its statutory goals. Here, PADS presented a plan to use the vacant Midlothian Manor in a way that comported with and promoted the Authority's statutory purposes, namely, to provide permanent housing support for chronically homeless persons through PADS's Safe Haven program. These actions are fully and expressly allowed by the language of the Act. Above, we wondered how to discern whether the use of a building constituted an exercise of the unit of government's statutory authority. The Act provides the answer: when the housing authority is performing an act assisting another entity that has presented a plan to develop or redevelop a property that furthers the housing authority's purposes. Here, the Authority leased the subject property (performed an act) to PADS so PADS could house its Safe Haven program at Midlothian Manor (PADS presented a plan to reutilize the then-vacant Midlothian Manor to house and run its Safe Haven program to alleviate the situations of chronically homeless persons, which fits squarely into the Authority's purpose of providing safe and sanitary housing for the disadvantaged population in the county).

¶ 57    In our view, the Act expressly permits the Authority to contractually partner with other entities to provide the types of services that further the Authority's goals and statutory purposes. See 310 ILCS 10/2, 8, 8.2, 8.5 (West 2014). The Unified Development Ordinance does not prohibit a unit of government from leasing a building it owns, so long as the lease causes the building to be used in a manner that comports with the exercise of the unit of government's statutory authority. Here, PADS would house and run its Safe Haven program at Midlothian Manor. The Safe Haven program supports the chronically homeless. The Authority's core purpose is to provide safe, decent, sanitary, and affordable housing to underserved and disadvantaged residents of the county. We conclude that leasing Midlothian Manor to PADS fits within the definition of "government use" in the Unified Development Ordinance.

¶ 58    Defendants argue that the definition of "government use" should be parsed differently. As to the first element, defendants focus on the term "leased." In defendants' view, the express inclusion of "leased" means that the unit of government must lease the building *from* another, and cannot, therefore, lease the building *to* another. This interpretation overlooks the placement of the disjunctive "or" between "owned" and "leased." It is the state of being owned by the unit of government that is alternate to and excluded from the state of being leased by the unit of government. The first element does not, however, limit whether the unit of government may lease (or even sublease) the building to another; rather, it specifies that the unit of government must have one of two interests in the building: an ownership interest or a leasehold interest. Defendants go astray by interpreting "leased" as unlinked to "owned" in the language of the ordinance. By doing this, defendants lose sight of the clearly discernible legislative intent.

¶ 59    Defendants argue that the first element specifically provides that the unit of government cannot be the landlord. Defendants base this contention on parsing the first element as "owned or leased *by* a unit of government" as opposed to "leased *from* a unit of government." According to defendants, "leased by" means that the unit of government is the tenant, whereas "leased from" means the unit of government is the landlord. This interpretation does violence to the grammatical rules. As we noted above, the first element can be broken down more finely. As identified by defendants, the first element is "[a] building or structure owned or leased by a

unit of government." The disjunctive "or" is logically applied distributively, resulting in four subgroupings: (1) a building owned by a unit of government, (2) a building leased by a unit of government, (3) a structure owned by a unit of government, and (4) a structure leased by a unit of government. The prepositional phrase, "by a unit of government," identifies the entity performing the action, namely "owning" or "leasing" the building or structure. Thus, the unit of government is doing the "owning" or the "leasing"; defendants' contention that the first element prohibits the unit of government from having the status of landlord simply does not follow because the first element describes what (a building or structure) is owned or is leased by the unit of government. In other words, it defines the type of interest (that of an owner or a lessee) possessed by whom (a unit of government) in what (a building or a structure). The first element does not preclude the unit of government from leasing (or subleasing) a building or a structure, so long as it possesses the requisite interest (owner or lessee).

¶ 60    Defendants argue that the second element, being joined to the first element by the conjunctive "and," is a necessary condition that must be fulfilled. As parsed by defendants, the second element is "and used by the unit of government." According to defendants, "the" in the second element means that it is the same unit of government in the first element. We agree. However, according to defendants, the second element means that the unit of government must be the direct user of the building or structure. "Used" in the second element has no qualifiers beyond the prepositional phrase, "by the unit of government," which does no more than specify who must "use" the building or structure. The prepositional phrase, then, identifies the user but gives us no information regarding whether that action may be performed either directly by the unit of government or indirectly by the unit of government through the agency of another entity.[4] To accept defendants' construction would be to read into the ordinance a condition not expressed by the language chosen by the legislative body; in other words, we would be adding a condition not contained in the ordinance itself, and this we may not do. *In re Brandon K.*, 2017 IL App (2d) 170075, ¶ 27.

¶ 61    Defendants argue that the third element also means that the unit of government must directly exercise its statutory authority. As parsed by defendants, the third element provides, "in exercising its statutory authority." Defendants contend that "its" in the third element refers to the unit of government and means that "the government entity must be using the property to carry out some aspect of its own statutory authority." Setting aside the problematic circularity of using the pronoun "its" to define what "its" means in the third element, we do not necessarily disagree. However, defendants' inference—that the government entity must be the direct user—is simply not sustainable. Instead, "in exercising its statutory authority" describes how the property must be used but does not require that the unit of government itself directly use the property in the exercise of its statutory authority, especially where, pursuant to that statutory authority, the unit of government may contract with another agency to fulfill its statutory goals. To accept defendants' construction would again read into the ordinance a condition not expressly stated in the language of the ordinance itself, and this we may not do. *Id.*

---

[4]The dissent conflates "use" in the zoning sense, as in the definition of "government use," with "use" in the casual or colloquial sense. *Infra* ¶¶ 112-13. Our discussion of direct and indirect uses is both a response to the arguments posed by defendants and an attempt to differentiate between the zoning and colloquial senses.

¶ 62      We therefore reject defendants' proposed construction of the "government use" provision of the Unified Development Ordinance. In our view, the Act expressly contemplates that a housing authority may enter into a contract with another entity in order to provide services related to the housing authority's statutory purposes. With this understanding, to read the Unified Development Ordinance in the way urged by defendants would actually frustrate the Act because if the ordinance prohibits a unit of government, such as the Authority, from using its statutory powers to act through another entity, then the ordinance is improperly negating those provisions of the Act. Instead, putting together the three elements of the definition of "government use" results in the conclusion that the Authority is not prohibited from leasing Midlothian Manor to PADS, pursuant to its right to contract as set forth in the Act (310 ILCS 10/8.5 (West 2014)), so long as the lease is pursuant to the Authority's statutory authority and results in a use that fulfills the Authority's statutory purposes.

¶ 63      Defendants argue that, because the Authority would not be directly using Midlothian Manor, it cannot fulfill the second element of the "government use" definition. As we discussed above, the second element does not require the unit of government's direct use. To so hold impermissibly reads into the ordinance a condition not expressed by its drafters. *Brandon K.*, 2017 IL App (2d) 170075, ¶ 27. Defendants also argue that a private tenant is not a unit of government and therefore has no statutory purpose, so the Authority cannot fulfill the third element. Defendants concede, however, that, here, the "private tenant [would use] the property for the government entity's statutory purpose." We discussed above that the third element does not require the unit of government to directly exercise its statutory authority but that it could exercise its statutory authority through an independent agency, such as PADS. To agree with defendants' argument would again impermissibly read into the ordinance a condition not expressed by its drafters. *Id.*

¶ 64      Defendants next argue that the proposed use of Midlothian Manor is not the sort of government action contemplated by the "government use" provision of the Unified Development Ordinance. To make this argument, defendants analogize to federal cases defining government action for purposes of section 1983 proceedings (42 U.S.C. § 1983 (2012)). Defendants' argument is inapt for at least two compelling reasons.

¶ 65      First and foremost, the "government use" provision is unambiguous. Where a provision is unambiguous, it must be given effect as written and without resort to other aids of statutory construction. *Henderson Square Condominium Ass'n*, 2015 IL 118139, ¶ 67. Second, section 1983 provides relief for a constitutional tort where the government has infringed upon the victim's constitutional rights. Section 1983 seeks to hold the government accountable for its tortious acts, so it distinguishes between government action and private action (to which it does not apply). Here, there is no question of tort liability; instead we are seeking to interpret the unambiguous "government use" provision, which does not limit the Authority to direct action but allows it to act indirectly through the agency of another.

¶ 66      Defendants argue that the state-action doctrine in the section 1983 context is a viable analogy because the question, as perceived by defendants, is when, if ever, do the actions of a private entity, contracting with and receiving funds from a government entity to perform what is typically a government function, constitute government actions? The question as posed by defendants does not hold together. It presupposes that the government entity is paying the private entity to carry out a program within its bailiwick. Here, there is no evidence to that effect. Instead, the record shows that PADS would lease the building, presumably paying the

Authority. The funding of PADS's Safe Haven program was not explored during the hearing. Defendants' central question, therefore, is based upon supposition and assumption. Moreover, PADS did not take over a program expressly constituted and overseen by the Authority, as defendants' question seems to imply. Instead, the Authority contracted with PADS to allow PADS to use Midlothian Manor for a program that PADS had developed that also had the salutary effect of furthering the Authority's statutory goals. The question of private action versus state action is necessary in the context of section 1983 to resolve the assignment of liability; here, "used by the unit of government in exercising its statutory authority" is not directly congruent with the section 1983 concept of private versus state action. Instead, "used by the unit of government" appears to be a much broader concept than "state action." We reject defendants' contention.

¶ 67                                 D. Assembly Space

¶ 68    Defendants argue that the Director incorrectly interpreted the "assembly space" provision of the Unified Development Ordinance (Lake County Code of Ordinances § 151.271 (amended Oct. 13, 2015)). Section 151.271 defines "assembly space" as: "Space intended to accommodate a group of people gathered together, for a particular purpose, whether religious, political, educational, or social. ASSEMBLY SPACE may include but shall not be limited to meeting rooms/halls, classrooms, worship halls, and social halls." *Id.* Defendants contend that the Director added conditions not expressed in the provision's definition of "assembly space" by requiring "assembly space" to include an element of public access. Defendants conclude that, because there is no public access expressly discussed in the provision, the Director improperly added a term not intended by the drafters.

¶ 69    We note that the Director classified the proposed use of Midlothian Manor as "government use (no assembly space)." Thus, strictly speaking, defendants' argument is not on point. Nevertheless, we interpret defendants' argument to imply that the Director erred in classifying the use as one without assembly space because Midlothian Manor does contain assembly space of less than 10,000 square feet.

¶ 70    The evidence presented during the hearing demonstrated that there are several sizable common areas within Midlothian Manor. However, the evidence also demonstrated that the residents would not receive services or hold meetings in these common areas. At most, the residents might gather, on an *ad hoc* basis, to share a meal or watch the television (although it is not entirely clear from the record that a common television would be provided).

¶ 71    The gravamen of the definition of "assembly space" is "a group of people gathered together[ ] for a particular purpose." *Id.* The plain and ordinary import of this phrase suggests a formal gathering, "religious, political, educational, or social," which is not the intended purpose of Midlothian Manor's common areas. In our view, then, the Director correctly determined that there was no assembly space within Midlothian Manor, as defined in the Unified Development Ordinance. The determinations of the reversing Board members based on the presence of assembly space are clearly erroneous.

¶ 72    Defendants base their assembly-space argument on the Director's purported importation of the concept of "public access" into the language of the "assembly space" provision of the Unified Development Ordinance. We do not adopt the Director's construction, but we hold that the clear and unambiguous language of the provision does not include residents' use of the

common amenities provided in the structure, such as a kitchen or a television. Accordingly, we reject defendants' contention.

¶ 73 Defendants argue that section 151.112(W) of the Unified Development Ordinance (Lake County Code of Ordinances § 151.112(W) (amended July 14, 2015)) limits the hours during which the subject property may operate. Section 151.112(W) provides, pertinently:

> "The standards of this subsection shall apply when a government use is located within a platted residential subdivision and takes direct access exclusively to a local road:
>
>> (1) *Operational requirement.* Hours of Operation shall be limited to 8:00 a.m. to 8:00 p.m. ***." *Id.*

Defendants argue that section 151.112(W) applies regardless of the presence of assembly space. We disagree.

¶ 74 Section 151.111 sets forth the use tables to which the Unified Development Ordinance applies. Lake County Code of Ordinances § 151.111 (amended July 14, 2015). Section 151.111(B)(4)(a) provides: "The final 'standards' column of the [zoning use table] contains references to use standards that apply to the listed use type." Lake County Code of Ordinances § 151.111(B)(4)(a) (amended July 14, 2015). Section 151.112(W) applies only to "government use (10,000 sq. ft. or less of assembly space)" and to "government use (more than 10,000 sq. ft. of assembly space)," but it does not, by the terms of the use table, apply to "government use (no assembly space)." Because section 151.112(W) does not apply to "government use (no assembly space)," the limitations on operating hours similarly do not apply. Accordingly, we reject defendants' argument.

¶ 75          E. Other Construction Errors

¶ 76 Defendants argue that the Director erred by not referring to appendix F of the Unified Development Ordinance. Lake County Code of Ordinances, ch. 151, app. F (adopted Oct. 13, 2009). Section 151.111(A) states: "Ordinance users interested in reviewing a more detailed listing of specific use types should review Appendix F. Appendix F will help users identify how specific use types are categorized under the new use category system of this chapter." Lake County Code of Ordinances § 151.111(A), Commentary (amended July 14, 2015). Defendants argue that appendix F provides a more detailed listing of use classifications than the use table of section 151.111. According to defendants, the Director erred when he did not consult appendix F.

¶ 77 The Director explained that he did not believe that appendix F was a regulatory portion of the Unified Development Ordinance but was only an informational exhibit that was trumped by the language of the ordinance itself. Defendants believe that there are two reasons this constituted error. First, because the use table in section 151.111 is more general than the corresponding more specific examples of appendix F. See Lake County Code of Ordinances § 151.010(B) (adopted Oct. 13, 2009) (in case of conflicting provisions in county ordinances, the more restrictive provision will control). Second, because "government use" is placed under "non-residential uses" in appendix F, so a government use must be forbidden in a residential zoning district.

¶ 78 As to the first point, specific controlling over general, "government use" in the section 151.111 use table is defined far more specifically than in appendix F. The use table defines

three types of government use: "government use (no assembly space)," "government use (10,000 sq. ft. or less of assembly space)," and "government use (more than 10,000 sq. ft. of assembly space)." In appendix F, government use is not differentiated by associated assembly space. Thus, government use is more specifically defined in the section 151.111 use table, and this should control.

¶ 79       As to the second point, under section 151.111, government uses are allowed in R-1 zoning districts as a matter of right where there is no assembly space and pursuant to conditional-use permits where there is assembly space. This conflicts with appendix F, which would apparently preclude any government use from any residential zoning district altogether. Once again, the section 151.111 use table is the more specific provision with respect to government use, and it therefore controls over the conflicting provision.

¶ 80       We note that none of the reversing Board members raised the failure to consult appendix F as an error in the Director's determination. To the extent that it was assigned as error, because section 151.111 controls over appendix F, the Director's failure to consult appendix F is immaterial. We reject defendants' contention.

¶ 81                                       F. Remaining Issues

¶ 82       Our starting point in analyzing defendants' contentions was the construction of the pertinent provisions of the Unified Development Ordinance because the Board (whose decision we are reviewing) reviewed the Director's determination under the Unified Development Ordinance. Defendants raise a number of other issues. We shall address these as necessary.

¶ 83                                 1. Compliance With the Act

¶ 84       Defendants argue that the proposed use for Midlothian Manor did not comply with the applicable local laws. Specifically, defendants contend that the proposed project did not comply with section 10 of the Act (310 ILCS 10/10 (West 2014)) or section 5-12001 of the Counties Code (55 ILCS 5/5-12001 (West 2014)). Defendants contend that the Authority asserted in plaintiffs' complaint that it was "somehow excused from complying with" the Unified Development Ordinance despite the clear language in the Act and the Unified Development Ordinance itself requiring that all development projects are subject to the local provisions in force at the site of the project. We disagree.

¶ 85       There are several fatal problems with this contention. Section 10 of the Act provides: "All projects of an Authority shall be subject to the planning, zoning, sanitary and building laws, ordinances and regulations applicable to the locality in which the project is to be situated." 310 ILCS 10/10 (West 2014). Section 151.003 of the Unified Development Ordinance provides that "all development, public and private, within unincorporated Lake County" shall be subject to the Unified Development Ordinance. Lake County Code of Ordinances § 151.003 (adopted Oct. 13, 2009). More specifically, all "land uses *** and all *** changes in[ ] and relocations of existing structures and uses occurring hereafter shall be subject to this [Ordinance], all statutes of this state, the Building Codes of this county, and all other applicable county ordinances, except as specifically provided in this chapter." *Id.*

¶ 86       The first and greatest fatal infirmity with defendants' contention is that it is simply not supported by the text of plaintiffs' complaint itself. There is simply no language in the

complaint that suggests, let alone "indirectly asserts," that the Authority is not subject to the Act or the Unified Development Ordinance. Indeed, the complaint asserts that the Board's decision improperly prevents the Authority from carrying out its statutory obligations under the Act and the Unified Development Ordinance.

¶ 87 Second, we are reviewing not the soundness of plaintiffs' complaint but the decision of the Board following a full hearing on the merits. Defendants' contention is mistimed and misplaced, as well as wholly inadequate, and their attempt to support it with authority and pertinent argument provides neither. See Ill. S. Ct. R. 341(h)(7) (eff. Feb. 6, 2013) (argument that is undeveloped or unsupported by pertinent legal authority is deemed waived or forfeited).

¶ 88 Finally, the Board never considered or reasoned that plaintiffs were not in compliance with the Act or the Unified Development Ordinance. Rather, the Board reasoned that the Director had erred in his interpretation and application of the Unified Development Ordinance, to the extent that such reasoning is discernible.

¶ 89 Now, defendants' ultimate position might well be that the Director's determination moves the change in use for Midlothian Manor out of compliance with the provisions of the Unified Development Ordinance. This, however, appears to be an ultimate conclusion based on a chain of legal reasoning, and not an independent argument in that chain of reasoning. Presented as a stand-alone argument, the contention is devoid of development or support, and we reject it.

¶ 90 2. Compliance With the Unified Development Ordinance

¶ 91 Defendants next contend that the Director's determination did not comply with the provisions of the Unified Development Ordinance. Defendants argue that the proposed use would be better classified as either group living or assisted living and that, under these classifications, the procedures required by the Unified Development Ordinance were not followed.

¶ 92 As regards group living, this is a prohibited use in the R-1 zoning district. Lake County Code of Ordinances § 151.111 (adopted Oct. 13, 2009). Zerba and Reindl both believed that the Midlothian Manor project should be classified as group living. Thus, the two members believed, and defendants contend, that the Director's classification as a "government use (no assembly space)" was erroneous.

¶ 93 In support, defendants point to the Director's testimony, in which he agreed that the proposed use could be similar to group living. Additionally, defendants cite instances in the testimony in which the phrase "group living" was employed regarding Midlothian Manor.

¶ 94 We do not doubt that, had the Director decided to characterize the proposed use for Midlothian Manor as a group-living facility, such a decision might have been supportable on the evidence presented. However, the Director determined that the project qualified as "government use (no assembly space)," and this is the decision the Board reviewed. We note that, although the Board was required to accord to the Director's determination a presumption of correctness, the Board was also able to render any decision that the Director could have rendered. Lake County Code of Ordinances § 151.058(G) (adopted Oct. 13, 2009). The Board, however, did not reach a consensus as to why the Director's decision was incorrect, even though it could have determined that the proper classification for the project was group living or some other use. Instead, the Board reversed the determination classifying the project as "government use (no assembly space)" without attempting to offer any appropriate

reclassification. We believe that, in so doing, the Board foreclosed defendants' argument along these lines.

¶ 95    Had the Board agreed to another classification, and not just to overturn the Director's determination, then we could also review the hypothetical reclassification. But the Board did not go that far; the Board held only that the Director's determination was incorrect, and that is the decision we must review. Defendants' contention that "group living" is a more appropriate classification appears to be an attempt to invoke the principle that the Board's decision may be supported by any ground appearing in the record. See *St. Paul Fire & Marine Insurance Co. v. City of Waukegan*, 2017 IL App (2d) 160381, ¶ 24 (a trial court's judgment may be affirmed on any ground appearing in the record). Although that principle might be generally applicable, the Board declared, at the outset of the proceedings and at the close of the evidence, that it was reviewing only the appropriateness of the Director's determination, not what other zoning or use would be appropriate. Additionally, the Board did not agree on an appropriate use, only that the Director's choice of "government use (no assembly space)" was incorrect. Indeed, two members held that "group living" was the proper use to assign to the project, and two members held that there was assembly space in the subject building, so maybe "government use" in combination with a nonzero amount of assembly space would have been acceptable (the two members did not appear to believe that "government use" was an erroneous classification). Thus, based on the Board's self-limitation on its deliberations and the fact that, unlike with a trial court, there is no singular judgment (beyond "the Director erred") that we can review, we believe that defendants' contention is misplaced. Accordingly, we reject it.

¶ 96    The dissent states that, *if* the Board had determined that "group living" was the appropriate classification, then the Board's decision would not be clearly erroneous. *Infra* ¶ 116. As we acknowledge, that might be true, but the Board *did not* determine that the classification ought to be "group living"; rather, the Board made the bare determination that the Director's determination was clearly erroneous. Indeed, no more than two Board members out of the six believed that a possible ground for the Board's determination was that "group living" was the more appropriate classification. Moreover, given the extremely broad powers conferred upon the Authority by the Act, including the power to fulfill its statutory goals by partnering with any organization, for-profit or not-for-profit, and the power to enter into contracts in order to further its statutory agenda, "government use" remains the better fit. Importantly, once "government use" is determined as the better fit, the Unified Development Ordinance forecloses the sort of second-guessing raised by defendants and entertained by the dissent. See Lake County Code of Ordinances § 151.271 (amended Oct. 13, 2015) (use-related terms are mutually exclusive). Thus, the Director's choice of "government use" both promotes and effectuates the Act's purposes and the Authority's implementation of its statutory goals.

¶ 97    Defendants make the similar argument that if we do not accept their group-living contention, then designating the use as "assisted living" is also available on the record before us. For the same reasons as expressed regarding group living, with the addition that not a single member suggested that "assisted living" would have been appropriate (and the assisted-living use was less developed in evidence than the group-living use), we reject this argument as well.

¶ 98    Next, defendants contend that "government use (10,000 sq. ft. or less of assembly space)" is an allowed use, requiring a conditional-use permit in an R-1 zoning district. This is a puzzling contention altogether because the Director granted the change-in-use permit based on

the classification of "government use (no assembly space)." Defendants' argument, then, is simply a *non sequitur*.

¶ 99    To the extent that defendants' contention can be followed, they seem to argue that "government use" is categorized within the Unified Development Ordinance as a "community service." Lake County Code of Ordinances § 151.111 (adopted Oct. 13, 2009). In turn, "community services" are defined as "uses of a public, nonprofit, or charitable nature." Lake County Code of Ordinances § 151.270(D)(3) (amended Aug. 14, 2012). However, the record shows that the Safe Haven program provides housing and support services to chronically homeless persons. Although this program might not be open to the public at large, it appears to be a fully charitable program operated by a not-for-profit entity. Thus, it falls squarely within the definition of "community services." Moreover, defendants focus only on the public aspect and overlook the charitable and nonprofit aspects of the definition. We reject defendants' contention.

¶ 100    Defendants next contend that we may affirm the Board's decision because the Director admitted that he did not follow the provision in the Unified Development Ordinance governing similar-use interpretations. Section 151.270(B)(1) provides that, "If an application is submitted for a use type not listed in § 151.111 [of the Unified Development Ordinance], the [Director] shall be authorized to make a similar use interpretation" based on enumerated factors. Lake County Code of Ordinances § 151.270(B)(1) (amended Aug. 14, 2012). Defendants note that the director of PADS submitted an application for a change in use that described the existing use as "vacant government" and described the project as "government use—Safe Haven project." Defendants contend that there is neither a "vacant government" use nor a "government use—Safe Haven project" described anywhere in the Unified Development Ordinance. Defendants reason that, therefore, the Director was required to make a similar-use interpretation, pursuant to section 151.270(B), and that the Director's failure to do so constitutes error for which his determination could be properly reversed. We disagree with the contention.

¶ 101    The change-in-use application asks first for the "existing use," and then it asks for a "description of [the] project." Although there is no use classification of "vacant government," that is simply the applicant's belief as to the existing use classification. The requested "description of project" appears to be precisely that, a brief description of the project. The application bears statements requiring the applicant to certify that the information and accompanying information is true and correct. The application also includes a line stating that the applicant acknowledges "that approval of this permit/project only authorizes (indicate specific use)," with a blank following in which to indicate the use. The director of PADS inscribed "government" in the blank, indicating "government use."

¶ 102    Defendants' contention is that the requested use did not exist in the Unified Development Ordinance, but "government use" is listed and defined within the ordinance, and we have explored it at length throughout this opinion. Defendants' argument is based on a mistaken premise because the use is defined and described in the Unified Development Ordinance. Defendants' contention appears to be based on the project description, which, again, referenced the expected government use and, in order to provide more specificity, included the title of the existing program as the project requiring the change in use: the Safe Haven program. Thus, although there is no "government use—Safe Haven project" use in the ordinance, it is clear that "government use" referred to the anticipated use, and "Safe Haven

project" provided the brief explanation of the project itself. We therefore reject defendants' contention.

¶ 103   As a final contention, defendants argue that the Director's failure to reference appendix F was wholly improper. We have already interpreted appendix F and determined that, especially in light of the evidence in the record, the Director was not required to consult appendix F because the use table in section 151.111 was the more specific provision regarding all of the various "government use" classifications. We need not revisit this ground, as we have adequately covered it above.

¶ 104                  3. The Formal Soundness of the Board's Judgment

¶ 105   Defendants next argue that the circuit court's judgment—that the Board was improperly concerned with the Director's procedure in arriving at his determination, instead of the substance of the determination—was incorrect. We need not address this argument, as it is wholly directed at the circuit court's judgment. The circuit court's judgment is not at issue here, and we have not considered it in any substantive way. Instead, our concern here is solely with the Board's judgment (*Goodman*, 241 Ill. 2d at 405), and defendants' argument about the circuit court's judgment sheds no appreciable light on the Board's judgment.

¶ 106   Similarly, defendants contend that the Board's judgment was sufficiently specific to comply with the standards required of an administrative review. Again, this is in response to the circuit court's judgment. We have also struggled with the structure of the Board's judgment, but that was more of a struggle over the substance and not the form. Once again, we need not address this issue because it concerns the circuit court's judgment and does not illuminate any of the substantive issues presented.

¶ 107                                III. CONCLUSION

¶ 108   For the foregoing reasons, we affirm the judgment of the circuit court of Lake County.

¶ 109   Affirmed.

¶ 110   PRESIDING JUSTICE HUDSON, dissenting.

¶ 111   As the majority observes, "Our task here is to review the Board's decision." *Supra* ¶ 45. As the majority further acknowledges, we must *defer* to that decision, reversing it only if it is "clearly erroneous." *Supra* ¶¶ 37-38. Not *arguably* erroneous, not *plausibly* erroneous, but *clearly* erroneous. Here, the Board decided that the proposed use is not a "government use." In my view, if we properly defer to the Board, as we are required to do, we cannot hold that its decision is clearly erroneous.

¶ 112   As the majority notes, a "government use" requires that a building be "owned or leased by a unit of government" and "used by the unit of government in exercising its statutory authority." Lake County Code of Ordinances § 151.271 (amended Oct. 13, 2015). It is clear that the Authority, a "unit of government," owns the building at issue here. But, in my view, it is *not* clear that the building would be "used by" the Authority.

¶ 113   Indeed, the Authority would not, *itself*, use the building at all; instead it would *lease* the building to PADS, and *PADS* would use it for its Safe Haven program. The common understanding of a lessor-lessee relationship is that, although the lessor owns the leased

property, he or she contracts to the lessee the right to "use" it. See *People v. Perry*, 224 Ill. 2d 312, 362 (2007) (Fitzgerald, J., dissenting, joined by Kilbride, J.) ("the tenant has the legal right to 'use' the premises until a court finds that the landlord has the right of possession"). Nothing indicates that the Authority here would be any different.

¶ 114 Interestingly, the majority *concedes* that the Authority would not be using the building itself, *i.e.*, "directly." *Supra* ¶ 60. However, the majority interprets the definition of "government use" to permit a unit of government to "use" property "indirectly," "through the agency of another entity." *Supra* ¶ 60. The majority thus posits that the Authority, having leased the building to PADS, would nevertheless be "indirectly" doing what PADS is actually doing. To my knowledge—and apparently to the majority's, as the majority does not cite any precedent—no lessor-lessee relationship has ever been described this way. The ordinance instructs that the terms it leaves undefined "shall be given their common, ordinary meanings, as the context may reasonably suggest." Lake County Code of Ordinances § 151.271 (amended Oct. 13, 2015). By declaring that a "use" may be "indirect," the majority is ignoring the common understanding of that term in this context.

¶ 115 The majority's conclusion of "indirect use" evidently springs from the mere fact that PADS's Safe Haven program is consistent with "the Authority's statutory purposes." *Supra* ¶ 56. I do not deny this. I would also acknowledge that PADS's Safe Haven program serves a beneficial public purpose. However, whether a government unit is using a building "in exercising its statutory authority" is pertinent only if, first, it is using the building at all. Again, here, the Authority would be leasing the building to PADS. The fact that the Authority approves of the use to which PADS would put it—and even the fact that the Authority could put it to that use itself—do nothing to establish that the Authority would actually ("indirectly") be using it. On the contrary, the building would be "used" only by PADS.

¶ 116 Or, at the very least, such a construction of that term is as reasonable as the majority's. As a result, the ordinance is at least ambiguous, and we must defer to the Board's construction of it. See *Hartney Fuel Oil Co. v. Hamer*, 2013 IL 115130, ¶ 16. At least in part, the Board concluded that the Authority's leasing the building to PADS would mean that PADS, and not the Authority, would be using it—that the use would not be a "government use." See *supra* ¶ 27. In my view, if we properly defer to the Board, we cannot hold that its conclusion is clearly erroneous.

¶ 117 However, even if I were to concede that the proposed use would squarely fit within the definition of a "government use," I would *still* affirm the Board's decision. This is because, no matter whether that definition applies, a *different* definition—"group living"—applies more specifically.

¶ 118 The ordinance defines "group living" as "[r]esidential occupancy of a structure by a group of people who do not meet the definition of 'household living'. Examples include dormitories, fraternities, sororities, monasteries, and convents." Lake County Code of Ordinances § 151.271 (amended Oct. 13, 2015). Clearly, by this definition, PADS would use the building for "group living." See *supra* ¶¶ 8-9. As board member Zerba put it, " 'I just can't think that it couldn't be group living.' " *Supra* ¶ 29. Frankly, I find it nearly impossible to dismiss this conclusion as clearly erroneous.

¶ 119 And the majority does not necessarily disagree; indeed, it acknowledges that "group living" might be an appropriate classification of the proposed use. *Supra* ¶ 94. However, the majority says, because the Board did not definitively apply that classification, it necessarily

decided only whether the classification of "government use" is inappropriate—"and that is the decision we must review." *Supra* ¶ 95.

¶ 120 The majority thus views the issue as simply whether the proposed use satisfies the definition of a "government use"—and either it does or it does not. But here the majority seems to be ignoring the ordinance. As the majority notes much earlier, the ordinance provides that "[t]he use-related terms are mutually exclusive, meaning that uses given a specific definition shall not also be considered to be a part of a more general definition of that use type. A 'bookstore', for example, shall not be considered a general 'retail sales and service' use, since 'bookstore' is a more specific definition of that use." Lake County Code of Ordinances § 151.271 (amended Oct. 13, 2015). Thus, in determining whether the classification of "government use" is inappropriate, the Board was *not* limited to determining whether the proposed use satisfies that definition. On the contrary, it was fully entitled to determine whether the proposed use *more specifically* satisfies *another* definition, in which case, indeed, the classification of "government use" is inappropriate. At least in part, the Board did precisely this, finding that, because the proposed use is more specifically "group living," the use is not a "government use." Once again, if we properly defer to the Board, we cannot hold that its decision is clearly erroneous. In fact, I submit, we could not declare it erroneous at all.

¶ 121 For these reasons, I respectfully dissent.