**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

2023 IL App (3d) 220433-U

Order filed July 5, 2023

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2023

| | | |
|---|---|---|
| HOUBOLT ROAD EXTENSION JV, LLC, | ) | Appeal from the Circuit Court |
| | ) | of the 12th Judicial Circuit, |
| Plaintiff-Appellant, | ) | Will County, Illinois, |
| | ) | |
| CENTERPOINT PROPERTIES TRUST | ) | |
| and CENTERPOINT JOLIET TERMINAL | ) | |
| RAILROAD, LLC, | ) | |
| | ) | |
| Interested Parties/Plaintiffs-Appellants, | ) | |
| | ) | |
| v. | ) | Appeal No. 3-22-0433 |
| | ) | Circuit No. 22-MR-138 |
| THE CITY OF JOLIET, | ) | |
| | ) | |
| Defendant-Appellee, | ) | |
| | ) | |
| EAST GATE-LOGISTICS PARK CHICAGO, | ) | |
| LLC; NEW WAVE FARMS, LLC; THE | ) | |
| COUNTY OF WILL; and THE | ) | |
| DEPARTMENT OF TRANSPORTATION, | ) | Honorable |
| | ) | John J. Pavich, |
| Interested Parties-Appellees. | ) | Judge, Presiding. |

JUSTICE DAVENPORT delivered the judgment of the court.
Justices Brennan and Albrecht concurred in the judgment.

**ORDER**

¶ 1    *Held*: The circuit court improperly dismissed plaintiff's complaint upon finding its allegations failed to state a breach of an intergovernmental contract. Contrary to the court's finding, not all of plaintiff's allegations lacked contractual basis. Reversed.

¶ 2    Plaintiff Houbolt Road Extension JV, LLC, appeals from the dismissal of its complaint seeking declaratory and injunctive relief against the City of Joliet (City). The complaint alleged that an annexation agreement between the City and East Gate-Logistics Park Chicago, LLC, (East Gate) infringed on a prior understanding between the City and plaintiff's predecessor in interest, CenterPoint Properties Trust (CNT), restricting truck-accessible routes adjacent to an intermodal complex developed by CNT and CenterPoint Joliet Terminal Railroad, LLC (collectively, CenterPoint). Finding the City's actions did not violate the prior understanding, the circuit court dismissed the complaint with prejudice. For the reasons stated below, we reverse.

¶ 3                                I. BACKGROUND

¶ 4    The facts stated herein are derived from plaintiff's verified complaint and its attached exhibits. Pursuant to a 2008 annexation agreement with the City, CenterPoint developed an intermodal freight complex in City-annexed territory south of Interstate 80 and west of Illinois Route 53 (hereinafter, CNT Intermodal Center, the intermodal complex, or the complex). The intermodal complex included rail-terminal facilities, distribution centers, and logistics centers. As originally designed, the complex was accessible to tractor-trailers via two roads: Baseline Road and Laraway Road. The parties under the 2008 agreement agreed that "the portion of Millsdale Road located east of intersection of Brandon Road and Millsdale Road *** shall not be designed or intended for use by commercial motor vehicles."

¶ 5                         A. Memorandum of Understanding

¶ 6    In December 2016, CNT entered into a memorandum of understanding (MOU) with the City, the County of Will, and the Illinois Department of Transportation (IDOT). The MOU

2

provided that CNT would assume responsibility for extending Houbolt Road, a road adjacent to the complex, "by constructing a bridge over the Des Plaines River." The bridge would create a third access point for tractor-trailers entering and exiting the intermodal complex. Under the MOU, CNT would fund the bridge's construction, estimated to cost over $125 million, and the parties would "take all reasonable steps to ensure that CNT can impose toll rates sufficient to support full funding of the BRIDGE." CNT later assigned plaintiff its rights and responsibilities under the MOU. Plaintiff began constructing the bridge in March 2021 and completed the project in April 2023.[1]

¶ 7                                     *The MOU's Restrictions*

¶ 8          The MOU restricts the City and County's ability to create alternative truck access points to the complex. Section XII(B) of the MOU provides as follows:

> "The CITY and COUNTY agree that they will take no steps or actions to (1) eliminate CNT's authority to impose tolls and place restrictions on North CenterPoint Way; (2) build new roads adjacent to the CNT Intermodal Center on which trucks may travel or build new roads that enter or exit the CNT Intermodal Center on which trucks may travel; and (3) eliminate trucking restrictions, weight limits, or other similar regulations on roads that enter or exit the CNT Intermodal Center or on roads that are adjacent to the CNT Intermodal Center."

The MOU defines "adjacent to the CNT Intermodal Center" as "all territory within the area depicted in Exhibit A to this MOU as the 'Study Area'." Illinois Route 53 forms the eastern boundary of the Study Area. Exhibit A to the MOU is included below.

---

[1]Houbolt Road extension opening to traffic April 27, American Journal of Transportation (Apr. 25, 2023, 12:29 PM), https://www.ajot.com/news/houbolt-road-extension-opening-to-traffic-april-27/.



¶ 9              Section XII(G) of the MOU provides, "[I]n no event shall the CITY improve Millsdale Road between Illinois 53 and the railroad tracks east of Brandon Road or Schweitzer Road between Illinois 53 and Brandon Road so as to legally permit truck traffic." The non-truck-accessible segments of Millsdale and Schweitzer Roads are between the railroad tracks and Route 53 in the map below, attached as Exhibit 4A to the verified complaint. The map identifies the three current truck-access points (circled below).

4



EXHIBIT 4A (ANNOTATED)

¶ 10    The MOU also restricts the County and IDOT's ability to change trucking restrictions within the Study Area. With respect to the County, the MOU provides that "in no event shall the COUNTY improve Arsenal/Manhattan Road from Baseline Road [now Houbolt Road] to Illinois 53 so as to legally permit truck traffic." Similarly, the MOU requires IDOT to notify CNT before taking steps to build new roads adjacent to the complex and before taking steps to change trucking restrictions for existing roads adjacent to the complex. The MOU requires IDOT, upon notifying CNT of its proposed action to change trucking restrictions, to meet with CNT to discuss the action's necessity and "any risk to the fiscal responsibility of the BRIDGE." The MOU's term is forty years from the date of execution.

¶ 11                            B. East Gate Agreement

¶ 12    In December 2021, the City entered into an "Annexation and Development Agreement" with East Gate to develop Compass Business Park, a light industrial business park just east of the CNT Intermodal Center (East Gate Agreement or agreement).

5

¶ 13                                    1. *Closed Loop Truck Network (CLTN)*

¶ 14          The agreement requires East Gate to develop Compass Park with a "closed loop truck network" (CLTN), complete with all necessary bridges, "to minimize the current amount of truck traffic on Illinois Route 53 and other local roads outside of the park." The proposed CLTN would include truck barriers, truck turnarounds, and cul-de-sacs "to prevent tractor-trailer access or egress to or from [Compass Park] other than via the CLTN." Tractor-trailers would be unable to access Compass Park from "Illinois Route 53, Manhattan Road, or other municipal or township road."

¶ 15          The agreement requires East Gate to build, as part of the CLTN, a truck-accessible roadway (Compass Parkway) connecting two proposed bridges: (1) a bridge "over the Union Pacific Railroad south of Millsdale Road" (Railroad Bridge) and (2) a bridge "over Illinois Route 53 in the vicinity of Breen Road" (Route 53 Bridge). Both bridges would be built by East Gate "to provide safe and restricted access for tractor-trailer traffic to and from [Compass Park]."

¶ 16          Upon completion, the Railroad Bridge would serve as a point of ingress and egress for tractor-trailers traveling between the CNT Intermodal Center and Compass Park. Until then, however, the agreement provides for a temporary intersection at Millsdale Road immediately east of the Union Pacific Railroad for tractor-trailers to access Compass Park. The agreement provides:

> "Developer [*i.e.*, East Gate] shall construct a temporary connection between Compass Parkway and Millsdale Road adequate to allow automobiles and tractor-trailers access to that portion of [Compass Park] west of Illinois Route 53 ("Temporary Connection"). Developer shall make no improvements to Millsdale Road and shall, upon the completion of construction and opening of a new

6

connection to Route 53 terminate Millsdale Road in a cul-de-sac. Upon completion of the Railroad Bridge, Developer shall remove the Temporary Connection."

The agreement does not elaborate on the "new connection to Route 53" and does not provide a timeline for the construction of the Railroad Bridge or the CLTN.

¶ 17                                2. *Proposed Millsdale Road Intersection*

¶ 18        A March 2021 traffic impact study completed on behalf of East Gate included the drawing below depicting the proposed location of Compass Parkway and the Railroad Bridge. The "temporary connection" between the proposed parkway and Millsdale Road is circled below, along with a proposed temporary truck barrier and turnaround just east of the intersection.



*Traffic Impact Study (3/2021); Exhibit 6 of the Verified Complaint*

The preliminary plat below shows the proposed parkway[2] and its "temporary connection" to Millsdale Road. Like the previous drawing, it shows a proposed truck barrier just east of the "temporary connection" (circled below). Unlike the previous drawing, however, the preliminary plat does not include the location of the proposed Railroad Bridge.

---

[2]The preliminary plats refer to the proposed development as Third Coast Intermodal Hub and its principal parkway Third Coast Parkway. Other parts of the record refer to the proposed business development as NorthPoint Compass Business Park. For consistency's sake, we use the names present in the East Gate Agreement: Compass Business Park and Compass Parkway.



*Preliminary Plat; Exhibit 8 of Verified Complaint*

The final plat below shows the proposed parkway, identified in the drawing as Lot 8, connecting with Millsdale Road. A proposed truck barrier can be seen on Millsdale Road to the east of the proposed intersection. Unlike the preliminary plat, the final plat does not show the parkway extending to the Union Pacific railway tracks.



*Final Plat; Exhibit 8 of Verified Complaint*

¶ 19        3. *City's Discretion to Temporarily Re-Route Truck Traffic outside of the CLTN*

¶ 20        The agreement also provides the City's discretion to temporarily re-route truck traffic outside of the CLTN:

> "Notwithstanding anything herein to the contrary, if, in the sole opinion of the City, an event renders, or is reasonably expected to render, all or a portion of the CLTN incapable of accommodating regular vehicular use for a period in excess of two hours (or some other shorter time frame determined solely by the City), the City shall temporarily authorize truck traffic routing via a mutually acceptable alternative route."

¶ 21        4. *Existing Weight Restrictions and Precedence Clause*

¶ 22        The agreement requires East Gate to honor any existing road weight restrictions but provides, "[T]o the extent of any conflict *** between the terms, provisions, or standards contained in this Agreement and the terms, provisions, or standards presently existing in the City ordinances, *** the terms, provisions, and standards of this Agreement shall govern and control."

¶ 23        5. *Dedication Requirement*

¶ 24        The agreement requires East Gate to dedicate the CLTN to the City "where appropriate," and to "pay all costs for all road, bridge, and utility construction planned to be dedicated to the City." The preliminary plats identify the proposed lots to be dedicated to the City. Lot 8 (Compass Parkway) is one such lot.

¶ 25        C. Procedural History

¶ 26        On May 9, 2022, plaintiff filed a two-count complaint seeking (1) to permanently enjoin the City from violating the MOU and undermining the basis for plaintiff's investment in the Houbolt Road extension project, and (2) a declaration of rights under the MOU, particularly the

provisions restricting the City's ability to create truck-accessible roads or to eliminate trucking restrictions on roads adjacent to the CNT Intermodal Center. On the same day it filed the complaint, plaintiff moved for an emergency temporary restraining order (TRO). Citing a threatened business interest, plaintiff sought to enjoin the City from voting on the subdivision plats in East Gate's proposed development and to enjoin the City from taking other "steps or actions" in violation of the MOU. On May 13, 2022, the circuit court denied the TRO, finding no risk of imminent harm and that it lacked authority to bar the City from legislative action. The City subsequently voted to approve East Gate's preliminary and final plats. Plaintiff did not appeal the denial of its TRO motion.

¶ 27    The court subsequently scheduled a two-day preliminary injunction hearing for July 2022, to decide whether plaintiff had a "clearly ascertainable right" under the MOU to secure an injunction against the City. Thereafter, on June 16, 2022, the City moved to dismiss the complaint (735 ILCS 5/2-615(a) (West 2022)), arguing it was not violating the MOU by permitting East Gate to build or improve roadways in conjunction with the development of East Gate's private property. Specifically, the City argued the MOU prohibits the City—not third parties—from taking steps or actions to build or improve roadways adjacent to the CNT Intermodal Center.

¶ 28    In late June 2022, the City moved to continue the July 2022 preliminary injunction hearing. The City argued that, because it had not yet filed an answer, it was precluded from introducing extrinsic evidence challenging plaintiff's allegation of a threatened "business interest"—namely, that plaintiff would not collect the tolls it expected due to East Gate's proposed development. The court granted the City's motion, citing judicial economy and noting that the parties had intended to present extrinsic evidence when they requested a two-day hearing block.

10

¶ 29　　　　On August 25, 2022, the court heard extensive oral argument on the City's fully briefed section 2-615 motion to dismiss. On October 18, 2022, the court issued a written order dismissing the complaint with prejudice. It found that the MOU's restrictions did not prohibit the City's alleged activities and did not extend to East Gate, a nonsignatory third party. The court acknowledged that while the MOU prohibited the City from taking any "steps or actions to build new roads," those words could not be extended to include the act of passing permits or authorizing a third party to pay for and build new roads on its own private property. The court's order did not address section XII(B)(3) of the MOU, which prohibited the City from taking "steps or actions to eliminate trucking restrictions, weight limits, or other similar regulations on roads that enter or exit the CNT Intermodal Center or on roads that are adjacent to the CNT Intermodal Center." Plaintiff filed a timely notice of appeal.

¶ 30　　　　In February 2023, we allowed the International Union of Operating Engineers Local 150, AFL-CIO to file an *amicus curiae* brief in support of the City. Ill. S. Ct. R. 345 (eff. Sept. 20, 2010).

¶ 31　　　　　　　　　　　　　　　　II. ANALYSIS

¶ 32　　　　Plaintiff argues its verified complaint stated a claim for relief based on the City's violations of the MOU. Plaintiff points to allegations in its complaint that the City violated the MOU (1) by requiring Millsdale Road's improvement with a new intersection designed to provide tractor-trailers a new access point into the CNT Intermodal Center, and (2) by taking "steps or actions" to eliminate truck restrictions on Millsdale Road and build new roads in the Study Area. Plaintiff also argues the circuit court abused its discretion when it "canceled" the preliminary injunction hearing. In response, the City argues the court properly dismissed plaintiff's claims based on the MOU's

11

plain language, and that it correctly held the motion-to-dismiss hearing before the preliminary injunction hearing. We begin with the circuit court's dismissal of plaintiff's complaint.

¶ 33    A section 2-615 motion to dismiss tests a complaint's legal sufficiency, asking whether the complaint, construed in the light most favorable to the plaintiff, alleges sufficient facts to establish a claim upon which relief may be granted. *Dent v. Constellation NewEnergy, Inc.*, 2022 IL 126795, ¶ 25. In ruling on a section 2-615 motion to dismiss, a court takes as true all well-pleaded facts apparent from the face of the complaint, including any attached exhibits. *Id.* Where the complaint's allegations conflict with an attached exhibit, the exhibit controls. *Brock v. Anderson Road Ass'n*, 287 Ill. App. 3d 16, 21 (1997). "A cause of action should not be dismissed pursuant to section 2–615 unless it is clearly apparent that the plaintiff cannot prove any set of facts that will entitle the plaintiff to relief." *Sloan Biotechnology Laboratories, LLC v. Advanced Biomedical Inc.*, 2018 IL App (3d) 170020, ¶ 21. A section 2-615 dismissal is reviewed *de novo*. *Id.*

¶ 34    The circuit court dismissed plaintiff's complaint for "fail[ing] to state a breach of the MOU." Although the court's analysis focused on section XII(B)(2) of the MOU, we do not limit our analysis to that provision as the complaint also alleged violations of sections XII(B)(3) and XII(G) of the MOU. Section XII(B) provides:

> "The CITY and COUNTY agree that they will take no steps or actions to (1) eliminate CNT's authority to impose tolls and place restrictions on North CenterPoint Way; (2) build new roads adjacent to the CNT Intermodal Center on which trucks may travel or build new roads that enter or exit the CNT Intermodal Center on which trucks may travel; and (3) eliminate trucking restrictions, weight limits, or other similar regulations on roads that enter or exit the CNT Intermodal Center or on roads that are adjacent to the CNT Intermodal Center."

Section XII(G) of the MOU provides:

> "Nothing in this MOU shall limit the CITY's ability to perform widening, resurfacing, or related improvement work on any road adjacent to the CNT Intermodal Center and under CITY jurisdiction. However, in no event shall the CITY improve Millsdale Road between Illinois 53 and the railroad tracks east of Brandon Road or Schweitzer Road between Illinois 53 and Brandon Road so as to legally permit truck traffic."

¶ 35     Preliminary, we note that both plaintiff and the City agree the MOU is a valid and enforceable contract. In construing a contract, the primary objective is to give effect to the parties' intent. *Thompson v. Gordon*, 241 Ill. 2d 428, 441 (2011). The contract's language is the best indicator of the parties' intent. *Id.* If the language is unambiguous, its plain and ordinary meaning dictates the parties' intent. *Id.* If, however, the language is susceptible to more than one meaning, the court may use extrinsic evidence to disambiguate the language. *Id.* The contract is construed as a whole, with each provision viewed in light of the other provisions. *Id.* A contract may not be construed "in a way that is contrary to the plain and obvious meaning of the language used." *Id.* "A clear and unambiguous contract term must be given its plain and ordinary meaning, and that interpretation may be used by the court to grant a motion to dismiss." *Chiurato v. Dayton Estates Dam & Water Co.*, 2017 IL App (3d) 160102, ¶ 28. Contract interpretation is reviewed *de novo*. *Sloan Biotechnology Laboratories, LLC*, 2018 IL App (3d) 170020, ¶ 21.

¶ 36     Plaintiff argues its complaint sufficiently alleged the City violated three distinct provisions in the MOU: sections XII(G), XII(B)(2), and XII(B)(3). We consider each provision in turn.

¶ 37                                     A. Section XII(G)

13

¶ 38 Section XII(G) provides, in part, "[I]n no event shall the CITY improve Millsdale Road between Illinois 53 and the railroad tracks east of Brandon Road *** so as to legally permit truck traffic." This provision categorically prohibits the City from improving Millsdale Road east of the railroad tracks so as to legally permit truck traffic. Plaintiff's proposed interpretation of this sentence strays from this commonly understood meaning. Under plaintiff's interpretation of section XII(G), the City is prohibited "from engaging in all of the 'happening[s]' and 'occurrence[s]' that would achieve the outcome of Millsdale Road *being improved* with an intersection 'so as to legally permit truck traffic.' " (Emphasis added.)

¶ 39 This reading distorts the plain meaning of the original sentence. In addition to taking liberties with the phrase "in no event," plaintiff's reading relegates "improve," the main verb in the original sentence, to a subordinate clause, where it is cut off from its grammatical agent[3] (*i.e.*, the City), subjected to the passive voice, and transformed into a potential outcome of a broad set of prohibited actions. "This interpretation does violence to the grammatical rules." *Housing Authority of County of Lake v. Lake County Zoning Board of Appeals*, 2017 IL App (2d) 160959, ¶ 59. Plaintiff's interpretation is, in fact, a reconstruction—one that significantly broadens the scope of prohibited activity. "A court will not rewrite a contract to suit one of the parties, but will enforce the terms as written." *Wright v. Chicago Title Insurance Co.*, 196 Ill. App. 3d 920, 925 (1990). Contrary to plaintiff's reading, section XII(G) proscribes only the City's improvement of Millsdale Road east of the railroad tracks so as to legally permit truck traffic. It does not prohibit the City from granting a third party permission to improve Millsdale Road. Section XII(G) does not provide an adequate basis for plaintiff's claims.

---

[3] In grammar terminology, an agent is a semantic role occupied by a noun that causes or initiates the action expressed by the verb. Paul Kroeger, *Analyzing Grammar: An Introduction* 54 (2005). In simple terms, it is the "doer" of the verb.

B. Section XII(B)(2)

¶ 41        Section XII(B)(2) states, in pertinent part, "The CITY and COUNTY agree that they will take no steps or actions to *** build new roads adjacent to the CNT Intermodal Center on which trucks may travel or build new roads that enter or exit the CNT Intermodal Center on which trucks may travel[.]" Plaintiff argues the circuit court failed to give effect to the phrase "steps or actions to build" and improperly interpreted the word "build" in isolation to mean the City itself must physically construct new roads. According to plaintiff, the circuit court's interpretation rendered the "steps or actions" phrase superfluous. Under plaintiff's interpretation, the proscribed "steps or actions" include "approval of an agreement that mandates the construction of new truck roads to be dedicated back to the City." We reject plaintiff's interpretation.

¶ 42        By agreeing to "take no steps or actions to *** build new [truck-accessible] roads," the City did not also agree to take no steps or actions *to permit third parties* to build new truck accessible roads. "[A] court will not add words or terms to an agreement to change the plain meaning of the parties as expressed in the agreement." *Stichter v. Zuidema*, 269 Ill. App. 3d 455, 459–60 (1995). Incomplete on its own, the phrase "take no steps or actions" is complemented by the infinitive "to build," which, by definition, is the sentence's principal verb to which the proscribed "steps or actions" are tethered. See Garner, Bryan A., *Garner's Modern American Usage*, 900 (Oxford University Press 2009) (defining "complementary infinitive" as "an infinitive that functions as the principal verb"). Together, the infinitive "to build" and the phrase "take no steps or actions" form a single semantic unit operating under a single agency relationship, that is, both fall under the agency of the pronoun "they," referring exclusively to the City and the County. The result of this compound unit is an emphatic prohibition against the *City's* (and the County's) building of truck-accessible roads.

¶ 43        Naturally, we also reject plaintiff's claim that such an interpretation renders the "steps or actions" phrase superfluous. The phrase "take no steps or actions" serves a preemptive function by forbidding not just the proscribed act itself, but also any steps that could lead to it. Section XII(B)(2) thus attempts to preemptively curb the City's construction of new truck-accessible roads by prohibiting the City from engaging in any steps or actions potentially leading to the City's construction of such roads. It does not, however, prohibit the City from taking steps to allow a third party to build roads supporting that third party's business development.

¶ 44        We further note, as the trial court noted, that the MOU was drafted by sophisticated parties. Had they intended to prevent the City, a municipal corporation with regulatory powers, from using those powers to allow a third party to build truck-accessible roads, they could have certainly included language to that effect. It is not the court's place to add that language. *Stichter*, 269 Ill. App. 3d at 459–60. We may not "remake a contract to give a litigant a better bargain than he himself was satisfied to make, and a contract must be enforced as written, not as one party later finds he would prefer it to be written." *Trochelman v. Village of Maywood*, 259 Ill. App. 3d 1, 3 (1994). Thus, we find that section XII(B)(2)'s plain language does not extend to third parties building new truck-accessible roads adjacent to the CNT Intermodal Center.

¶ 45        The dedication of new truck-accessible roads to the City "where appropriate" does not change this conclusion. In light of section XII(B)(2)'s unambiguous import, dedication to the City is relevant only to a theory that the City was the true actor behind the new road construction. Such a theory is plainly contradicted by the verified complaint and the East Gate Agreement, both of which overwhelming demonstrate that (1) East Gate voluntarily entered the agreement with the City and (2) East Gate's proposed development is unfeasible without new truck-accessible roads. See *In re Village of Bull Valley*, 392 Ill. App. 3d 577, 586–87 (2009) (although municipal code

16

prevented village from annexing subject territory by ordinance, nothing in code prohibited landowners' annexation petition, *even if encouraged by village*, where landowners voluntarily executed petition). Accordingly, section XII(B)(2) does not provide a basis for plaintiff's claims.

¶ 46                                    C. Section XII(B)(3)

¶ 47        Section XII(B)(3) states, in pertinent part, "The CITY and COUNTY agree that they will take no steps or actions to *** eliminate trucking restrictions, weight limits, or other similar regulations on roads that enter or exit the CNT Intermodal Center or on roads that are adjacent to the CNT Intermodal Center." Plaintiff argues it sufficiently alleged the City took steps or actions to eliminate trucking restrictions by approving the East Gate Agreement and planning a vote on East Gate's proposed subdivision plats, which direct truck traffic onto Millsdale Road "where trucks will necessarily violate posted [weight] restrictions."

¶ 48        In response, the City argues that allegations it eliminated trucking restrictions must fail because the pertinent weight-restrictions ordinance remains in effect. The City's argument is premised on a flawed interpretation of section XII(B)(3).

¶ 49        Contrary to the City's interpretation, section XII(B)(3) does not solely limit modifications of City ordinances. It prohibits, more broadly, "steps or actions" by the City "to eliminate trucking restrictions, weight limits, or other similar regulations." Nothing in section XII(B)(3) requires the elimination of regulations to be effectuated through the City's legislative powers. Here, the verified complaint alleged that the agreement provides for a "temporary connection" directing truck traffic onto a section of Millsdale Road where trucks are prohibited. The East Gate Agreement, attached as a complaint exhibit, requires East Gate to develop a "temporary connection between Compass Parkway and Millsdale Road adequate to allow *** tractor-trailers access." The complaint also alleged that the City scheduled a vote on East Gate's proposed subdivision plats, which include

17

depictions of the proposed "temporary connection" at Millsdale Road. Construed in the light most favorable to plaintiff, these factual allegations are sufficient to allege the "steps or actions" proscribed under section XII(B)(3) of the MOU.

¶ 50    The City also argues that plaintiff's claim is contradicted by the agreement itself, in which East Gate agreed "to honor any weight restrictions while they may exist." This argument is unavailing. East Gate's promise to honor existing weight restrictions does not affect the sufficiency of plaintiff's complaint. Simply, a third party's promise does not affect plaintiff's allegation that *the City* is taking steps or actions to eliminate trucking restrictions. Plaintiff has sufficiently pled a claim upon which relief may be granted. *Dent*, 2022 IL 126795, ¶ 25.

¶ 51    E. Preliminary Injunction Hearing

¶ 52    In summary, plaintiff's verified complaint is sufficient to withstand dismissal. Plaintiff's allegations fail to state a claim with respect to sections XII(G) and XII(B)(2) of the MOU but are sufficient with respect to section XII(B)(3). While we do not believe the court abused its discretion in postponing the July 2022 preliminary injunction hearing to rule on the City's motion to dismiss, plaintiff has sufficiently alleged a violation of the MOU and should be allowed to present evidence on whether it possesses a clearly ascertainable right in need of protection. On remand, the court should conduct a hearing on plaintiff's preliminary injunction request without delay.

¶ 53    III. CONCLUSION

¶ 54    For the foregoing reasons, we reverse the circuit court's judgment and remand for further proceedings consistent with this order.

¶ 55    Reversed.

18